Judge Parker

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'08 CIV 5360

-------------------------------------------------------------X

NICOLE SPENCE,

                      Plaintiff,

        v.

INNER CITY BROADCAST CORPORATION,
ICBC BROADCAST HOLDINGS, INC.,
WENDY WILLIAMS-HUNTER, also known as
"WENDY WILLIAMS," in her
official and individual capacities, and
KEVIN HUNTER, in his official and individual
capacities,

                    Defendants.

-------------------------------------------------------------X

Civil Action No. _____

**Complaint**

**Jury Trial**
**Demanded**

RECEIVED
JUN 1 1 2008
U.S.D.C. S.D. N.Y.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Nicole Spence ("Ms. Spence" or "Plaintiff"), by and through her

undersigned counsel, as and for her Complaint in this action against Defendants Inner

City Broadcast Corporation ("Inner City"), ICBC Broadcast Holdings, Inc. ("ICBC")

(both Inner City and ICBC referred to as the "Company"), Wendy Williams-Hunter, also

known as Wendy Williams ("Williams"), and Kevin Hunter ("Hunter") (collectively

"Defendants"), hereby alleges as follows:

### NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendants' unlawful employment practices and retaliation

against Plaintiff, including Defendants' discriminatory treatment, harassment and

unlawful retaliation against Plaintiff, due to her gender and complaints of discrimination,

in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e

et seq. ("Title VII"), the New York State Human Rights Law, New York Executive Law §§ 290 et seq. (the "NYSHRL"), and the New York City Human Rights Law, New York Administrative Code §§ 8-101 et seq. (the "NYCHRL"), as well as for Defendant Williams' and the Company's defamation of Plaintiff.

2.    During her employment at the Company, Plaintiff has been forced to work in a hostile work environment based on her gender.  Specifically, Defendants have subjected Plaintiff to numerous acts of gender discrimination and harassment, as well as to unlawful retaliation.  In that hostile work environment, Plaintiff has been degraded as a woman, subjected to vulgar acts of sexual harassment, repeatedly sexually propositioned, verbally abused, called a "stupid fucking bitch," cursed and yelled at, and physically threatened with violence.

3.    Despite receiving Plaintiff's written and verbal complaints about such unlawful conduct, the Company failed to take prompt remedial action.  To the contrary, the Company and Defendant Williams have embarked on a campaign of unlawful retaliation against Plaintiff because of her complaints.  By way of example only, the Company and Defendant Williams have stripped Plaintiff of her material job duties and Defendant Williams physically threatened and nearly attacked Plaintiff in the workplace.

4.    Defendant Williams and the Company have also committed defamation against Plaintiff.  Specifically, in a New York Post article that reported Plaintiff's allegations of sexual harassment and unlawful retaliation, Defendant Williams defamed Plaintiff in that article by stating, "This bitch is out of her mind," which has subjected Plaintiff to public scorn, ridicule and humiliation.

5. Defendant Williams made this defamatory statement in her capacity as an employee and within the scope of her employment at the Company.

6. Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff, which has caused, and continues to cause, Plaintiff to suffer substantial damages, permanent harm to her professional and personal reputations, and severe mental anguish and emotional distress.

### JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

### PARTIES

9. Plaintiff Nicole Spence is an employee of the Company and a resident in the State of New York, Bronx County. At all relevant times, she met the definition of an "employee" under all applicable statutes.

10. Defendant Inner City Broadcast Corporation is a radio broadcasting company that targets urban radio listeners. At all relevant times, Defendant Inner City has had its principal place of business located at 3 Park Avenue, New York, New York and regularly transacts business in this district.

11. Defendant ICBC Broadcast Holdings, Inc. is a subsidiary of Inner City Broadcast Corporation that owns and operates eighteen radio stations in various cities

3

across the country, including in New York City, San Francisco, Philadelphia, Fort

Lauderdale and Columbia, South Carolina. At all relevant times, Defendant ICBC has

had its principal place of business located at 3 Park Avenue, New York, New York and

regularly transacts business in this district.

12.    At all relevant times, Defendants Inner City Broadcast Corporation and

ICBC Broadcast Holdings, Inc. have met the definition of an "employer" under all

applicable statutes.

13.    Upon information and belief, Defendants Inner City Broadcast

Corporation and ICBC Broadcast Holdings, Inc. share common ownership, common

premises, common directors and/or officers, and common financial control.

14.    Upon information and belief, they also share common management and

control over labor relations and personnel policies and practices, including the hiring and

firing of employees. By way of example only, Defendants Inner City Broadcast

Corporation and ICBC Broadcast Holdings, Inc. share a single Human Resources

Department.

15.    Upon further information and belief, Defendants Inner City Broadcast

Corporation and ICBC Broadcast Holdings, Inc. co-mingle funds and other capital assets

and are also operationally interrelated and interdependent upon one another.

16.    Defendant Wendy Williams-Hunter, also known as Wendy Williams, is an

employee of the Company and, upon information and belief, currently resides in Cedar

Grove, New Jersey. At all relevant times, she has actively and directly participated in the

discrimination, harassment, unlawful retaliation and defamation committed against

Plaintiff.

17.    Further, at all relevant times, Defendant Williams had authority to make personnel decisions concerning Plaintiff's work schedule, salary and other employment benefits. Defendant Williams also had and continues to have authority to discipline, including the right to hire and fire, Plaintiff and other Company employees and interns.

18.    Defendant Kevin Hunter is Williams' husband and manager who, upon information and belief, also resides in Cedar Grove, New Jersey. At all relevant times, Defendant Hunter has actively and directly participated in the discrimination, harassment, and unlawful retaliation taken against Plaintiff and acted as an agent of the Company.

## PROCEDURAL REQUIREMENTS

19.    Ms. Spence has complied with all statutory prerequisites to her Title VII claims, having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 24, 2008, and having received notice of her right to sue from the EEOC on or about May 29, 2008. This action has been filed within 90 days of receipt of her EEOC right to sue letter.

20.    Prior to the commencement of this action, a copy of this Complaint was served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

21.    Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.      WBLS and "The Wendy Williams Experience"**

22.     Defendant ICBC's flagship station is WBLS, which is an urban contemporary FM radio station located in New York City and operating on 107.5 mhz. The offices and broadcast studio of WBLS are located at 3 Park Avenue in Midtown Manhattan.

23.     One of Defendant ICBC's most popular radio programs is "The Wendy Williams Experience," which is broadcast on WBLS weekdays from 2:00 p.m. to 7:00 p.m. "The Wendy Williams Experience" is a radio show that focuses on gossip and allows listeners to call in for advice. It is also syndicated on numerous radio stations across the country, including in Los Angeles and Columbia, South Carolina, and frequently rated by Arbitron as having one of the largest audiences in its time slots.

24.     Upon information and belief, "The Wendy Williams Experience" generates millions in revenues for Defendants Inner City and ICBC each year.

**II.     Defendant Wendy Williams**

25.     Defendant Williams is a well-known radio personality and host of "The Wendy Williams Experience," who has also written several books, has had a reality television show on the cable network VH1 and publicly touts herself as the "Queen of All Media."

26.     During her radio program, Defendant Williams often interviews celebrities, recording artists, actors, authors and other high profile individuals and gives advice to her listeners.

6

### III.    Nicole Spence's Employment

27.    In or about August 2004, Nicole Spence began working at the Company as an intern for "The Wendy Williams Experience."

28.    Based on her exemplary work performance, Ms. Spence was promoted in or around May 2006 to her current position of Talent Booker/Publicist, also referred to as the Talent Producer, for "The Wendy Williams Experience."

### IV.    Ms. Spence's Prior Job Duties and Close Working Relationship with Defendant Williams

29.    As the Talent Booker, Ms. Spence booked guests for "The Wendy Williams Experience" and interacted with representatives, managers and publicists of recording artists, actors and other celebrities.  Prior to her complaints of sexual harassment and gender discrimination, Ms. Spence was not required to seek prior approval from anyone at the Company for guests she wanted for the show because she was so successful in booking celebrities and other notable guests.  Although not required, Ms. Spence nonetheless made a practice of reviewing her selected guests with Defendant Williams, who almost always "rubber stamped" Ms. Spence's proposed bookings.

30.    As part of Ms. Spence's job duties, she worked closely with Defendant Williams on a daily basis, often discussing ideas for the show and guests and individuals whom they hoped to get on the program in the future.  Ms. Spence also conducted research on scheduled guests or subjects that would be discussed on the show and wrote the questions that Defendant Williams would ask during her interviews on the program.

31.    In fact, Ms. Spence's and Defendant Williams' working relationship was so close and Ms. Spence's work performance was so critical to the success of "The Wendy Williams Experience" that Ms. Spence's desk was located inside Defendant

Williams' office at the Company, which employees commonly refer to as "The Pink Room."

32.    As Talent Booker, Ms. Spence also met guests in the lobby of WBLS on the date of their interviews and prepared each guest for his or her appearance on "The Wendy Williams Experience." Further, Ms. Spence often entered the broadcast studio while the show was live on the air, with or without guests. When Ms. Spence was in the studio, Defendant Williams would at times have her participate in some of the interviews of guests on the air, which resulted in Ms. Spence frequently appearing on the air and interacting with Defendant Williams, her co-host and her guests.

33.    Ms. Spence's outstanding work performance and enormous contributions to "The Wendy Williams Experience" helped the program receive top ratings for many demographics during the afternoon slot in a number of markets throughout the country. As just one such example, Ms. Spence booked recording artist Macy Gray, whose appearance on the show resulted in one of the highest ratings ever for the program, according to the new PPM ratings system.

34.    Due to Ms. Spence's exemplary work performance and extraordinary commitment to the success of "The Wendy Williams Experience," Defendant Williams openly and repeatedly praised Ms. Spence over the air to her listeners, and even told her radio audience that "Nicole is the best booker in the business, bar-none."

## V.    Defendant Williams' Supervisory Authority Over Ms. Spence

35.    Throughout Ms. Spence's employment at the Company, Defendant Williams had great influence and exercised supervisory authority over Ms. Spence. For example, Defendant Williams set Ms. Spence's work hours, and granted her requests for

days off and/or vacation. Moreover, on the rare occasions when Ms. Spence could not go to work because she was sick, Ms. Spence had to call in to Defendant Williams to report that fact. Upon information and belief, Defendants Williams and Hunter also negotiated Ms. Spence's salary with the Company and advised that they negotiated with the Company for Ms. Spence to receive a pay raise which she ultimately did not receive due to the events described below.

## VI.    Defendant Kevin Hunter's Presence in the Workplace

36.    Defendant Kevin Hunter is not, and upon information and belief, has never been, an employee of Defendant Inner City, Defendant ICBC or WBLS.

37.    Moreover, Defendant Williams has publicly described Defendant Hunter, her husband, as a "thug" who has a "nasty temper."

38.    Despite these facts, Company executives allowed Defendant Hunter to bypass security and have practically unlimited access to the offices and broadcast studio of WBLS throughout Plaintiff's employment. As a result, Defendant Hunter was consistently in the workplace, sometimes three or four times per week. He would enter the broadcast studio whenever he pleased and spend hours on end in the office on many days.

39.    In fact, Defendant Hunter was even given free reign to use Company premises and telephones and often held meetings in the workplace with many non-employees, conducting business unrelated to the Company or "The Wendy Williams Experience."

40.    Defendant Hunter was also given substantial control over Defendant Williams' radio program. By way of example only, Defendant Williams would comply

when Defendant Hunter often called the office and/or studio, demanding that she "shout out" or mention certain businesses or recording artists or play specific records during the broadcast. Further, whatever changes Defendant Hunter ordered be made during the live radio broadcast had to made immediately.

## VII.    Perks, Power and Authority Given to Defendant Hunter by The Company

41.    In addition, Company executives paid for Defendant Hunter, and at times his girlfriend, to go with Company employees on trips to Puerto Rico, Jamaica and other places and gave him his own Company parking spot.

42.    The Company also allowed Defendant Hunter to exercise decision-making authority over Ms. Spence and other employees and interns in the workplace. For example, despite the fact that he was not an employee of the Company, Defendant Hunter was allowed to call Ms. Spence every morning and dictate job assignments to her.

43.    Defendant Hunter even had the power to hire, fire and suspend employees and interns at the Company, and he ordered a number of suspension and terminations, which were often carried out by Defendant Williams and with the Company's acquiescence. For example, when Ms. Spence once did not answer Defendant Hunter's telephone call after midnight, he had Defendant Williams suspend her for two weeks.

44.    Defendant Hunter also repeatedly threatened to terminate Ms. Spence and other female employees, saying "we don't have a problem letting ya'll motherfuckers go." At other times, he would charge into Defendant Williams' office, "The Pink Room," demand that "everyone get the fuck out," and scream obscenities at Ms. Spence, often leaving her humiliated and in tears. This abusive conduct by Mr. Hunter over the

female staff of The Wendy Williams Experience" was blatant, open and obviously known to the Company.

## VIII.   Defendant Hunter's Discriminatory Treatment and Harassment of Plaintiff and Other Female Employees on the Basis of Their Gender

45.    Defendant Hunter's abusive conduct typically targeted female employees and he routinely degraded Ms. Spence and other of her female colleagues on the basis of their gender.  For example, he openly called women "bitches" in the workplace and screamed obscenities towards female employees while rarely yelling at their male counterparts.

46.    Defendant Hunter also demanded that female interns in the office be instructed to wear bikinis and serve drinks to Defendant Williams and her guests.  When the female intern coordinator to whom this demand was made objected to it and refused to comply, Defendant Hunter threatened to terminate her employment.

47.    Defendant Hunter even often verbally abused, disrespected and degraded his wife in the workplace in front of Ms. Spence and other employees and management, and openly called her a "bitch," "fucking bitch," "stupid bitch," "whore," "motherfucker" and "dumb ass."  He would also call the office or studio almost daily to speak with Defendant Williams, often yelling and demanding that the person who answered the call "put her motherfucking ass on the phone."

48.    When Ms. Spence and other female employees complained to Defendant Williams about her husband's improper conduct in workplace, she would ignore their complaints or respond by saying, "you know what you signed on for."

## IX.    Sexual Harassment Committed Against Plaintiff

49.    Ms. Spence was also subjected to constant and degrading acts of sexual harassment in the workplace by Defendant Hunter.

50.    By way of example only, Defendant Hunter, who had no right to even be on Company premises, repeatedly sexually propositioned Ms. Spence at work, in the most crude and vulgar ways.  For example, he told her over and over that he wanted to "fuck" her, called Ms. Spence on her cell phone at all hours of the night and told her that he had been dreaming about sleeping with her.

51.    While in the workplace, Defendant Hunter also told Ms. Spence that she had a "big butt," was "going to be a hot bitch" and that she needed "a real man" in her life to mold her into the woman she was supposed to be, and proclaimed that he was that man.

52.    Ms. Spence found Defendant Hunter's sexual advances and vulgar sexual comments completely offensive and rejected them.

53.    She also complained to Company management about Defendant Hunter's sexual harassment and other improper conduct, but the Company failed to take prompt remedial action.

54.    Thereafter, Defendant Hunter's sexual propositions of Ms. Spence escalated into the realm of the obsessive with Defendant Hunter often asking her who she was "fucking," which Ms. Spence found offensive and degrading.

55.    Indeed, Defendant Hunter became more offensive, hostile and threatening towards Ms. Spence after she continued to reject his constant sexual demands, calling her

a "bitch," "stupid bitch" and "stupid fucking bitch" in the workplace and in the presence of other employees and Company management.

56.     Defendant Hunter also told a male employee at the Company that because Ms. Spence would not "fuck" him, "there must be something wrong with her pussy."

57.     When Plaintiff refused to give in to his demands for sex, Defendant Hunter told a male employee to "get at her," to "get into that bitch's head" to "fuck her" in order to "break her down physically and mentally" and to ensure that she "did not forget where she came from" and then "keep his foot on her throat."

58.     Defendant Hunter's sexual harassment of Ms. Spence was so open and pervasive at the Company that a representative in Human Resources admitted that she personally heard him sexually proposition Ms. Spence in the workplace and warned Ms. Spence to watch out because Defendant Hunter was boasting that he wanted to "fuck" her.  Despite this knowledge, the Company continued to allow Defendant Hunter to have unfettered access to the workplace and to verbally abuse, intimidate and demand sex from Ms. Spence.

## X.     Acts and Threats of Violence in the Workplace

59.     In addition to subjecting Ms. Spence and other women in the office to discriminatory treatment, verbal abuse and harassment based on their gender, Defendant Hunter also committed violence against Defendant Williams in the broadcast studio of WBLS and in the presence of Ms. Spence and other employees.

60.     Specifically, on one occasion, while Ms. Spence was in the studio with Defendant Williams and others, Defendant Hunter stormed into the room, yelled and demanded that the employees leave and openly physically abused Ms. Williams, pinning

her against the wall with his hand around her neck, choking her while repeatedly pounding his fist into the wall directly by her head. Defendant Hunter was furious that Defendant Williams had been smoking cigarettes, which he had apparently forbidden her from doing.

61.    This act of violence increased Ms. Spence's concerns about her own safety in the hostile work environment at the Company.

62.    During another incident, Defendant Hunter reportedly punched Ms. Williams in the face and violently attacked her in a parking lot near WBLS and used by Company employees.

63.    Defendant Hunter also physically threatened to commit violence against Ms. Spence in the office. Specifically, on one occasion, Defendant Hunter charged at Ms. Spence while threatening to inflict physical harm on her, which caused Ms. Spence to further fear for her safety at the Company.

64.    In addition to these serious acts violence and intimidation, Ms. Spence recently learned that Defendant Hunter had asked a male employee who was working at the Company at the time to help him find someone to kill rival radio personality Tarsha Jones, also known as "Miss Jones" on radio station *Hot 97*, because he was apparently angry over some comments that "Miss Jones" made about his wife over the air. Similarly, Ms. Spence also learned that Defendant Williams herself asked that same individual to help her get someone to kill her husband, Defendant Hunter.

## XI.  Defendant Williams' Improper Conduct in the Workplace

65.    Defendant Williams, for her part, has aided and abetted the discrimination, harassment and abuse that Ms. Spence and other female employees were subjected to by her husband, and even offered to take Ms. Spence shopping so she could dress "like a sexy little bitch" as Defendant Hunter wanted.

66.    In fact, Defendant Williams' lack of respect for proper workplace conduct is demonstrated by the fact that she has engaged in *quid pro quo* sexual harassment with a male subordinate, who repeatedly complained to Ms. Spence that he had to have sex with Defendant Williams out of fear that he would lose his job if he refused to do so.  This same employee even confided in Ms. Spence that he would receive calls from Defendant Williams at night and was forced to listen to her masturbate over the telephone.

67.    During Ms. Spence's employment at the Company, she also learned that Defendant Williams had a sexual relationship with a married senior executive of the Company.  Upon information and belief, Defendant Williams told a male employee that she had to perform sexual acts on this senior executive, giving Ms. Spence greater concern not only about the discriminatory work environment that she was subjected to, but also about management at the Company itself upon whom she depended to stop the sexual harassment that she complained of repeatedly.

## XII.  Complaints About the Unlawful Conduct and The Company's Failure to Act

68.    The Company has received a number of complaints about the hostile work environment, including Defendant Hunter's improper conduct, from Ms. Spence and other female employees, but failed to take prompt remedial action in response to those complaints.

69.    For example, in or around January 2008 and pursuant to the Company's written equal employment opportunity policy, Ms. Spence complained about the hostile work environment and Defendant Hunter's sexual harassment to Vinny Brown, who was the Program Director at WBLS at that time. Mr. Brown responded to Ms. Spence's complaint about Defendants Williams and Hunter by saying, "we know who these people are and who we're dealing with." Despite Mr. Brown's knowledge of Ms. Spence's complaint and his position of authority at the Company, management failed to investigate the matter or take any prompt remedial action.

70.    On or about February 19, 2008, Ms. Spence also complained about the hostile work environment to Cynthia Smith, the Assistant Program Director at WBLS, who directed Ms. Spence to bring her complaints to Deon Levingston, the Vice President and General Manager of WBLS.

71.    Immediately thereafter, Ms. Spence complained to Mr. Levingston that she was concerned for her personal well-being and safety because of Defendant Hunter's sexual harassment and abusive conduct. She also told Mr. Levingston that she previously complained to Mr. Brown, who did nothing to protect her. The General Manager did not state that he would investigate her complaint and, upon information and belief, failed to even conduct an appropriate investigation into the matter.

72.    Ms. Spence also submitted a written complaint to Human Resources describing Defendant Hunter's sexual harassment and explicitly stated that she was "afraid of him," and that she felt like "a battered woman or abused child." In that complaint, Ms. Spence further stated that "the office is run by street gangster tactics" and that she was "afraid to be in that environment."

73.     Despite having full knowledge of Defendant Hunter's unlawful conduct and violent temperament, the Company failed to protect Ms. Spence and other female employees from him or the hostile work environment that Defendants Hunter and Williams created, fostered and condoned.  Rather, on the very day that Company executives finally took any action with respect to Ms. Spence's complaints and had purportedly banned Defendant Hunter from the building, they allowed Defendant Hunter to retaliate against Ms. Spence by roaming the hallways for nearly an hour searching for her and screaming "where's Nicole!?"  While Defendant Hunter was looking for her throughout the offices of the Company that day, Ms. Spence was forced to hide in Human Resources out of fear for her physical well-being.

### XIII.   Unlawful Retaliation by the Company and Defendant Williams

74.     In response to Ms. Spence's complaints of gender discrimination and sexual harassment, Company executives and Defendant Williams have committed various acts of unlawful retaliation against Ms. Spence in an effort to force her to quit her employment at WBLS.

75.     By way of example only, within days of receiving her first written complaint about the hostile work environment, the Company unilaterally re-located Ms. Spence's desk out of "The Pink Room" and away from the other staff of "The Wendy Williams Experience," leaving her isolated and unable to perform her job effectively.

76.     The relocation of Ms. Spence's desk signaled to Defendant Williams that she was one of the employees who complained about her husband's unlawful conduct.  It also served to punish Ms. Spence by moving her away from the on-going contact and on-

air participation with the show, which undermined her position at the Company and as a

Talent Booker in the radio industry.

77.    After Ms. Spence was moved to another part of the office, Defendant

Williams immediately refused to work with Ms. Spence, acknowledge or even speak with

her, ordered Ms. Spence banned from the broadcast studio, and rejected virtually all

guests booked by Ms. Spence without explanation.

78.    Defendant Williams also summarily cancelled guests booked by Ms.

Spence at the last minute, even if they had been scheduled for weeks, traveled from out of

state and/or were in the lobby of the building waiting to be brought upstairs to appear on

her show, which has severely damaged Ms. Spence's professional reputation.

79.    In response to such retaliation by Defendant Williams, Ms. Spence has

repeatedly complained to management at the Company, explaining, amongst other things,

that she was "extremely concerned," because "she [Wendy Williams] is attempting to

blackball her" after she "worked diligently for the past 4 and a half years

establishing…contacts and …credibility as a booker," and now it was apparent that

Defendant Williams was trying to completely destroy her reputation in the industry.

80.    Once again, the Company responded ineffectively to Ms. Spence's

complaints.  For example, when Defendant Williams returned to the airwaves in February

2008, following a two-day suspension for refusing to work with Ms. Spence, Defendant

Williams began her first show back to the sounds of gun shots and mockingly said on the

air, "You thought you got me, but I'm still standing!" and "You missed."  Williams also

defiantly stated on the air that someone else booked a rapper who appeared on the show

later that day.

81.    Despite receiving a complaint from Ms. Spence regarding this matter, the Company, upon information and belief, failed to conduct an investigation or take any remedial action.

82.    As such, Defendant Williams has continued to unlawfully retaliate against Ms. Spence for her complaints of gender discrimination and sexual harassment by summarily rejecting guests she booked.

83.    Specifically, Ms. Spence provided Defendant Williams with a list of potential guests for the months of March and April. Defendant Williams placed a giant "X" over the entire list and wrote "No!" without any explanation and which was purely retaliatory in nature.

84.    Furthermore, the Company has itself participated in this concerted effort to unlawfully retaliate against Ms. Spence.

85.    For example, despite Ms. Spence's prior access to the broadcast studio, Company executives have now banned her from the studio and everywhere else that Defendant Williams may frequent so that Ms. Spence can use only one hallway, changed her job duties to make sure that she has absolutely no interaction with Defendant Williams throughout the workday and now require that she get their approval in advance to book any guests.

86.    Ms. Spence has also been stripped of her material booking duties and actually replaced as the Talent Booker for "The Wendy Williams Experience" by other individuals, including by a friend of Defendant Hunter, who is not an employee or otherwise affiliated with the Company.

87.    For example, on or about April 29, 2008, Defendant Williams rejected Ms. Spence's suggestion to have rapper "Lil' Mama" on the show as a guest. Yet, on or about May 1, 2008, "Lil' Mama" appeared on "The Wendy Williams Experience," after she was booked by Defendant Hunter's friend.

88.    Similarly, other guests, such as music mogul Russell Simmons, Newark Mayor Corey Booker and rapper "The Game," were summarily rejected by Defendant Williams when proposed by Ms. Spence. Yet, "The Game" later appeared on the show when booked by other individuals.

89.    While Ms. Spence still has the title of Talent Booker for "The Wendy Williams Experience," the fact that she is not allowed to actually book any guests on the show and perform her previous duties has further damaged her reputation and the progression of her career in the radio, music and entertainment industries. As a consequence of this retaliatory removal of duties, Ms. Spence is now perceived as being powerless and ineffective at her job.

90.    By way of example only, on June 3, 2008, Defendant Williams refused to allow Hill Harper, an accomplished actor and author, to appear on "The Wendy Williams Experience" and promote his new book that is targeted to many of the radio program's female listeners, solely because Ms. Spence proposed him as a guest. Mr. Harper was even on the show previously when he had his last book out, and Defendant Williams invited him to come back on the show.

91.    When Ms. Spence explained to Mr. Harper's publicist that Mr. Harper would not be able to come on the radio program, that publicist, who represents a number of high-profile clients in the entertainment industry, told Ms. Spence that she was

"useless" in the business now and clearly no longer a decision-maker at "The Wendy Williams Experience" and that therefore there was no reason to call her anymore.

92.     Defendant Williams has even refused to interview singer Donna Summers, whom she has said many times she loves, because Ms. Spence proposed that booking.

93.     As part of her unlawful retaliation against Ms. Spence, Defendant Williams also attempted to provoke a physical confrontation with her in the workplace. Specifically, on or about April 30, 2008, while Ms. Spence was discussing program ideas with the Executive Producer of "The Wendy Williams Experience," near the telephone studio (and not the broadcast studio), Defendant Williams charged at Ms. Spence and put her hands in Ms. Spence's face yelling, "You're not supposed to be here." Ms. Spence thought that Defendant Williams was about to physically attack her. Indeed, the Program Director at WBLS, Skip Dillard, had to intervene to separate Defendant Williams from Ms. Spence. Company management, however, later blamed Ms. Spence for that incident and instructed her to "stay away from areas that Wendy is in or around."

94.     Most recently, during the morning of June 5, 2008, as Ms. Spence was walking down Park Avenue on her way to work, Defendant Williams drove by her closely in a car and began screaming at Ms. Spence, shouting "Nicole, you bitch" and making other humiliating comments to her.

95.     Despite Ms. Spence's various complaints about the hostile work environment and the continued acts of unlawful retaliation she has had to endure, the Company has still refused to properly investigate or address her complaints. In fact, the Company, as set forth above, continues to contribute to the retaliation.

96.     As a result of the foregoing, Ms. Spence has suffered, and continues to suffer, severe emotional distress, humiliation, and substantial damage to her reputation and career.

### XIV.    Defendant Williams' and The Company's Defamation of Plaintiff

97.     On or about March 24, 2008, after Ms. Spence filed her EEOC Charge of Discrimination, the New York Post wrote a story about the allegations.

98.     When the New York Post reporter asked Defendant Williams about Ms. Spence's allegations, she responded by stating "This bitch is out of her mind." That quote by Defendant Williams appeared in the New York Post and on the newspaper's website on or about March 25, 2008 and was read by tens of thousands of people in New York City, throughout the country and abroad.

99.     Defendant Williams made this defamatory statement in her capacity as an employee and within the scope of her employment at the Company.

100.    Defendants Williams' and the Company's defamatory statement about Ms. Spence to the New York Post was intended to publicly and severely damage Ms. Spence's reputation and current and future career to countless individuals, and was made in retaliation for Ms. Spence's protected complaints of discrimination.

101.    As a result of the foregoing, Ms. Spence has suffered, and continues to suffer, emotional distress, humiliation and damage to her reputation and career.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Title VII)

102.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 101, inclusive, as if fully set forth herein.

103.    The Company has discriminated against Plaintiff on the basis of her sex, in violation of Title VII by denying to her equal terms and conditions of employment, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful harassment, and stripping her of her job responsibilities.

104.    The Company has discriminated against Plaintiff on the basis of her sex, in violation of Title VII by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive harassment of Plaintiff.

105.    As a direct and proximate result of the Company's unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

106.    As a direct and proximate result of the Company's unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

107.    The Company's unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of Title VII)

108.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 107, inclusive, as if fully set forth herein.

109.    The Company retaliated and continues to retaliate against Plaintiff in violation of Title VII for her opposition to Defendants' discriminatory practices toward her and other female employees and/or her complaints about Defendants' discriminatory practices toward her and other female employees.

110.    As a direct and proximate result of the Company's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

111.    As a direct and proximate result of the Company's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

112.    The Company's unlawful retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Discrimination and Harassment in Violation of
### New York State Human Rights Law)

113.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 112, inclusive, as if fully set forth herein.

114.    Defendants Inner City Broadcast Corporation, ICBC Broadcast Holding, Inc., Williams and Hunter have discriminated against Plaintiff on the basis of her sex, in violation of the New York State Human Rights Law by denying her equal terms and conditions of employment, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful harassment and stripping her of her job responsibilities.

115.    Defendants have discriminated against Plaintiff on the basis of her sex, in violation of the New York State Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff.

116.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

117.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress,

including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

118.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 117, inclusive, as if fully set forth herein.

119.    Defendants retaliated and continue to retaliate against Plaintiff in violation of the New York State Human Rights Law for her opposition to Defendants' discriminatory practices towards her and other female employees and/or her complaints about Defendants' discriminatory practices towards her and other female employees.

120.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

121.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

122.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 121, inclusive, as if fully set forth herein.

123.    Defendants Williams and/or Hunter knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

124.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

125.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York City Human Rights Law)

126.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 125, inclusive, as if fully set forth herein.

127.    Defendants have discriminated against Plaintiff on the basis of her sex, in violation of the New York City Human Rights Law by denying her equal terms and conditions of employment, including but not limited to, denying her the opportunity to

work in an employment setting free of unlawful harassment, and stripping her of her job responsibilities.

128.    Defendants have discriminated against Plaintiff on the basis of her sex, in violation of the New York City Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff.

129.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

130.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the New York City Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

131.    Defendants' unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Retaliation in Violation of New York City Human Rights Law)

132.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 131, inclusive, as if fully set forth herein.

133.    Defendants have retaliated and continue to retaliate against Plaintiff in violation of the New York City Human Rights Law for her opposition to Defendants' discriminatory practices towards her and other female employees and/or her complaints about Defendants' discriminatory practices towards her and other female employees.

134.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

135.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

136.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York City Human Rights Law)

137.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 136, inclusive, as if fully set forth herein.

138.    Defendants Williams and/or Hunter knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York City Human Rights Law.

139.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

140.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

141.    Defendants Williams' and/or Hunter's unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A NINTH CAUSE OF ACTION

### (Defamation And Slander <u>Per</u> <u>Se</u>)

142.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 141, inclusive, as if fully set forth herein.

143.    Defendants Williams and the Company either published, or caused to be published, defamatory statements about Plaintiff.

144.    Defendants Williams' and the Company's defamatory statements included false assertions about Plaintiff, specifically "This bitch is out of her mind."

145.    Defendants Williams and the Company published said statements to the New York Post on or about March 24, 2008.

146.    Said statements were untrue and defamatory in that they falsely reported Plaintiff's character, actions and/or capacity, and Defendants Williams and the Company knew or should have known that such statements were false and would be disseminated to a people in New York City, throughout the country and abroad.

147.    Defendants Williams and the Company published said statements with malice.

148.    Defendants Williams and the Company published such statements with knowledge of their falsity and/or with a reckless disregard for the truth or falsity of such statements.

149.    Said statements constitute defamation and/or slander <u>per</u> <u>se</u> because they impugn Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities that would tend to injure Plaintiff in her trade or business.

150.    Said statements have caused Plaintiff embarrassment and emotional injury.

151.    Defendant Williams is liable to Plaintiff for defamation.

152.    Defendant Williams made this defamatory statement in her capacity as an employee and within the scope of her employment at the Company, and as such the Company is also liable to Plaintiff for defamation.

153.    Defendants Williams and the Company knew or should have known of the falsity of such statements made to the New York Post.

154.    Upon information and belief, Defendant Williams and the Company have made, and continue to make, these and similarly false and defamatory statements about Plaintiff to third parties.

155.    As a result of said defamation, Plaintiff continues to suffer from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace and severe and extreme emotional distress.

156.    The acts of Defendants Williams and the Company were intentional, willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Plaintiff without regard for Plaintiff's well-being and were based on a lack of concern and ill-will towards Plaintiff and/or a deliberate or reckless disregard for her, for which Plaintiff is entitled to an award of punitive damages.

157.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but no less than $5 million.

## AS AND FOR A TENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

158.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 157, inclusive, as if fully set forth herein.

159.    Defendants engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society.

160.    Among other conduct, Defendants' pervasive pattern of harassment and discrimination, and tolerance and encouragement of the hostile and abusive treatment of Plaintiff and other female employees, constitutes extreme and outrageous conduct that exceeds the bounds of decency in a civilized society.

161.    By their actions and conduct, Defendants intended to and did intentionally or recklessly cause Plaintiff to suffer severe emotional distress.

162.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer severe emotional distress, for which she is entitled to an award of damages.

163.    Defendants' extreme and outrageous conduct was knowing, malicious, willful and wanton, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A ELEVENTH CAUSE OF ACTION

### (Negligent Hiring, Training and Supervision)

164.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 163, inclusive, as if fully set forth herein.

165.    In hiring and supervising management and employees, the Company had and continues to have a duty to prevent such personnel from engaging in discriminatory,

tortious and/or otherwise unlawful conduct.

166.    The Company negligently and/or recklessly failed to satisfy its duty of care in hiring, supervising and retaining personnel that have engaged and continue to engage in a pattern and practice of discriminatory, tortious and/or otherwise unlawful conduct.

167.    The Company knows or should have known that Defendants Williams and Hunter engaged in unlawful conduct towards Plaintiff and other female employees of the Company based on their gender, as well as committed unlawful retaliation against Plaintiff because of her complaints of discrimination.

168.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer injuries, for which she is entitled to an award of damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful and/or tortious conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these

unlawful employment practices are eliminated and do not continue to

affect her employment and personal lives;

D.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate Plaintiff for all monetary and/or

economic damages, including but not limited to, the loss of past and future

income, wages, compensation, seniority and other benefits of

employment;

E.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate Plaintiff for all non-monetary and/or

compensatory damages, including but not limited to, compensation for her

mental anguish, humiliation, embarrassment, stress and anxiety, emotional

pain and suffering, emotional distress and physical injuries;

F.    An award of damages in an amount to be determined at trial, plus

prejudgment interest, to compensate Plaintiff for harm to her professional

and personal reputation and loss of career fulfillment;

G.    An award of damages in an amount to be determined at trial, but no less

than $5 million, to compensate Plaintiff for the defamation that

Defendants Williams and the Company committed against her;

H.    An award of damages for any and all other monetary and/or non-monetary

losses suffered by Plaintiff in an amount to be determined at trial, plus

prejudgment interest;

I.    An award of punitive damages;

J.    An award of costs that Plaintiff has incurred in this action, as well as

Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

and

K.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York

June 11, 2008

Respectfully submitted,

THOMPSON WIGDOR & GILLY LLP

By: _____
Kenneth P. Thompson
Kathryn J. Webber
Jordan K. Merson

350 Fifth Avenue, Suite 5720
New York, NY 10118
Telephone: (212) 239-9292
Facsimile: (212) 239-9001

COUNSEL FOR PLAINTIFF